UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CLEAN COAL TECHNOLOGIES, INC.,

                              Plaintiff,

              -v.-                                    17 Civ. 9678 (KPF)

LEIDOS, INC., formerly known as SCIENCE        **OPINION AND ORDER**
APPLICATIONS INTERNATIONAL CORP, and
DILO PAUL,

                              Defendants.

KATHERINE POLK FAILLA, District Judge:

Several lawsuits in several courts have risen from the ashes of the failed

business relationship between Clean Coal Technologies, Inc. ("CCTI" or

"Plaintiff") and Leidos, Inc. ("Leidos").  In this most recent action, CCTI brings

claims for breach of contract, tortious interference with contract, and tortious

interference with prospective economic advantage against Leidos, and brings

the latter two claims against a Leidos employee, Dr. Anton Dilo Paul (together

with Leidos, "Defendants"), in his personal capacity.  Both Defendants have

moved to dismiss the claims against them in CCTI's Amended Complaint.  For

the reasons that follow, Dr. Paul's motion is granted in part, and Leidos's

motion is granted in full.

## A.    Factual Background

### 1.    The Parties

For purposes of the instant motions, the Court accepts as true the well-pleaded allegations of the Amended Complaint.  CCTI is a coal technology company incorporated in Nevada with a principal place of business in New York.  (Am. Compl. ¶¶ 1, 12).  Leidos is a Delaware corporation with a principal place of business in Virginia.  (*Id.* at ¶ 2).  Leidos is an engineering advisory firm.  (Paul Br. 1).  Dr. Paul is an employee of Leidos and a resident of Pennsylvania; he also holds restricted shares of CCTI stock.  (Am. Compl. ¶ 3).

### 2.    The Pilot Plant Contracts

The business dealings underlying the instant dispute relate to the development of a pilot plant for CCTI's coal dehydration technologies in Shady Point, Oklahoma (the "Pilot Plant").  (Am. Compl. ¶¶ 12-104).  In May 2015, CCTI entered into an Amended and Restated Engineering, Procurement and Construction Management Contract (the "Construction Contract") with

---

[1]    This Opinion draws its facts from the Amended Complaint ("Am. Compl." (Dkt. #43)).  The Court also draws from certain documents that the parties agree are incorporated by reference in the Amended Complaint and that are attached as exhibits to the Declaration of Thomas R. Fallati ("Fallati Decl." (Dkt. #51)).

For ease of reference, the Court refers to the parties' briefing as follows: the Memorandum of Law in Support of Leidos, Inc.'s Motion for to Dismiss as "Leidos Br." (Dkt. #50); Defendant Dr. Anton Dilo Paul's Memorandum of Law in Support of His Motion to Dismiss Plaintiff's First Amended Complaint as "Paul Br." (Dkt. #52); Plaintiff's Memorandum of Law in Opposition to Leidos's Motion to Dismiss as "CCTI Leidos Opp." (Dkt. #61); Plaintiff's Memorandum of Law in Opposition to Dr. Anton Dilo Paul's Motion to Dismiss as "CCTI Paul Opp." (Dkt. #62); Leidos's Reply Memorandum of Law as "Leidos Reply" (Dkt. #67); and Dr. Paul's Reply Memorandum of Law as "Paul Reply (Dkt. #68).

Benham Constructors, LLC ("Benham"), which was previously known as Leidos Constructors, LLC. (*Id.* at ¶¶ 13-15). Benham was a Leidos subsidiary at that time. (*Id.*). On December 14, 2015, Leidos and CCTI entered into a Professional Services Agreement (the "Services Agreement") by which Leidos would assist CCTI with the development of the Pilot Plant. (*Id.* at ¶¶ 17, 18).

On March 16, 2016, Leidos announced that it had completed the sale of Benham to The Haskell Company ("Haskell"). (Am. Compl. ¶ 19). Around the same time, Benham informed CCTI that it had completed testing at the Pilot Plant. (*Id.* at ¶ 20). On April 15, 2016, Leidos informed CCTI that it was closing out the Construction Contract, as Leidos did not wish to have the contract assigned to Haskell. (*Id.* at ¶ 22). Leidos stated at the time that the payment to close out the construction contract was $96,893.64. (*Id.*). The sale of Benham to Haskell closed in July 2016. (*Id.* at ¶ 33). CCTI, however, consistently disputed the final invoice that Benham provided to it to close out the Construction Contract. (*Id.*).

### 3. The Paul Email

On April 28, 2016, Dr. Paul sent an email to CCTI regarding progress on the Pilot Plant (the "Paul Email"). (Am. Compl. ¶ 23). The Paul Email was described as a "draft response to potential investors [in CCTI] that were following CCTI's progress on the pilot plant." (*Id.*). Generally speaking, it provided an optimistic report regarding the CCTI's technology. (*Id.* at ¶¶ 27-31). CCTI states that the email led it to believe "that it had a 'fully validated

technology' and available data that could be used to encourage investors and other business partners to support CCTI's efforts." (*Id.* at ¶ 31).

### 4. The Construction Contract Dispute

An orderly dissolution of the Construction Contract proved elusive. CCTI claims that Leidos or Benham removed a password for the computer system at the Pilot Plant, along with materials identified as "Carrier CDs" and a Secure Digital (or "SD") card containing data for the Plant's control system (the "SD Card") — all despite the Construction Contract's provision of title in these items to CCTI. (Am. Compl. ¶¶ 34-37). In June 2017, CCTI requested that Leidos provide the password and the SD Card to it. (*Id.* at ¶¶ 37-38). CCTI states that, instead, between June 7, 2017, and July 14, 2017, Leidos maintained the SD Card and then improperly provided it to Benham rather than CCTI. (*Id.* at ¶¶ 39-40).

On July 14, 2017, Benham stated that it would not return the Carrier CDs or the SD Card until CCTI made a $425,979.51 payment to Benham under the Construction Contract. (Am. Compl. ¶ 41). CCTI alleges that Benham's refusal to return this material left it unable to operate the Pilot Plant. (*Id.* at ¶¶ 50-51).

On July 28, 2017, CCTI and Benham reached a settlement agreement by which Benham would provide CCTI with the password, Carrier CDs, and the SD Card, and CCTI would release its claims against Benham. (Am. Compl. ¶¶ 53-55). CCTI hired a different firm, Kiewit Engineering Group, Inc. ("Kiewet"), to re-start the plant and run additional tests, and CCTI claims that

these actions led to the discovery of additional breaches by Benham of the Construction Contract. (*Id.* at ¶¶ 56-57). CCTI further states that it discovered that a second Leidos employee, Tom Ezel, had billed time for services he did not perform under the Construction Contract. (*Id.* at ¶¶ 61-62). CCTI states that, ultimately, it was required to pay $2 million to bring the Pilot Plant to the proper operating condition. (*Id.* at ¶ 63).

### 5. The Services Agreement Dispute

CCTI further alleges that Leidos and Dr. Paul communicated false or misleading information to investors and potential investors in CCTI regarding CCTI technology. (Am. Compl. ¶ 84). CCTI states that Dr. Paul reached out to investors who relied on the Paul Email, and that he also traveled to New York on May 13, 2016, in order to make a presentation on behalf of CCTI to potential investors from Shenuan, China. (*Id.* at ¶¶ 85-86). However, CCTI was unable to obtain investments from potential investors in October 2016 and November 2016, due to Leidos's failure to provide testing data that was required under the Services Agreement. (*Id.* at ¶¶ 87-88). CCTI does not allege that either of these two potential investors was the Shenuan investor group. (*See id.*).

CCTI claims that Dr. Paul, on behalf of Leidos, billed CCTI for numerous services that he did not perform, and that CCTI discovered this malfeasance when it regained the password to the Pilot Plant in August 2017. (Am. Compl. ¶¶ 64-69). CCTI also alleges that Dr. Paul refused to produce a comprehensive report on tests of CCTI's technology for the U.S. Department of Energy ("DOE"),

as the Services Agreement required, until CCTI delivered an additional

$70,000.  (*Id.* at ¶¶ 74, 76-78).  On August 31, 2017, in response to CCTI's

assertions that Leidos's failure to produce Dr. Paul's report would be a breach

of the Services Agreement, Dr. Paul produced a report.  (*Id.* at ¶¶ 79-80).  CCTI

alleges that the report was not compliant with the Services Agreement and

contained numerous inaccuracies, but, due to Dr. Paul's prior assurances to

DOE that it would receive a report, CCTI was forced to submit the report to

DOE.  (*Id.* at ¶ 80).  After DOE itself noticed inaccuracies in the report, CCTI

was required to pay Kiewet to prepare a new report.  (*Id.* at ¶¶ 81-83).

### 6.    The DOE Dispute

More broadly, CCTI alleges that Leidos and Dr. Paul interfered with

CCTI's relationship with DOE.  CCTI alleges that while it was negotiating with a

potential investor in October 2016, Dr. Paul requested that CCTI issue him

stock before the deal closed.  (Am. Compl. ¶¶ 92-94).  And when CCTI declined

to issue stock, Dr. Paul told DOE that CCTI was financially unstable, in order

to poison that relationship.  (*Id.* at ¶¶ 95-97).  CCTI alleges that the

relationship between it and Dr. Paul became even more strained when Dr. Paul

requested a "reliance" letter to make the CCTI shares he owned unrestricted,

and CCTI refused.  (*Id.* at ¶¶ 98-100).  CCTI alleges that this dispute led Dr.

Paul to provide his inaccurate August 31 report, which report contradicted the

earlier Paul Email and damaged the relationship between CCTI and DOE.  (*Id.*

at ¶¶ 101-04).

### 7. The New York State Action

On March 21, 2017, Leidos sued CCTI in New York State Supreme Court, in an action styled as *Leidos Inc.* v. *Clean Coal Technologies, Inc.*, Index No. 505651/17 (N.Y. Sup. Ct.) (the "New York State Action"). (Am. Compl. ¶ 105). On March 23, 2017, the parties to that action stipulated that the balance owed to Leidos under the Services Agreement was $131,539.06. (*Id.* at ¶ 106). Leidos filed the stipulation and obtained a judgment. (*Id.* at ¶ 109). CCTI now argues that this judgment was improperly obtained.

## B. Procedural Background

Plaintiff filed a summons with notice in New York State Supreme Court on October 27, 2017. (Dkt. #1). On December 8, 2017, Leidos, with the consent of Dr. Paul, removed the action to this court. (*Id.*). On December 13, 2017, Defendants filed an Answer with Counterclaims (Dkt. #4), and, on March 15, 2018, Plaintiff filed its Complaint (Dkt. #18).

Following a conference on June 12, 2018, this Court issued a scheduling order for motion practice and discovery. (Dkt. #42). Pursuant to this Order, CCTI filed its First Amended Complaint on July 9, 2018. (Dkt. #43). The First Amended Complaint brings four causes of action: (i) breach of contract against Leidos for breach of the Services Agreement; (ii) tortious interference with the Construction Contract against Leidos; (iii) tortious interference with the Services Agreement against Dr. Paul; and (iv) tortious interference with prospective economic advantage against Leidos and Dr. Paul. (Am. Compl. ¶¶ 111-41).

On August 6, 2018, Leidos and Dr. Paul filed separate motions to dismiss.  (Dkt. #49-54).  Leidos and Dr. Paul both moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, and Dr. Paul also moved to dismiss under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.  (*See* Leidos Br. 1; Paul Br. 7).  On October 8, 2018, Plaintiff filed memoranda of law in opposition to Defendants' motions to dismiss.  (Dkt. #61, 62).  On October 19, 2018, Leidos and Dr. Paul filed their respective replies in support of their motions to dismiss.  (Dkt. #67, 68).  The Court begins by addressing the antecedent issue of jurisdiction, and then addresses the four causes of action alleged in the Amended Complaint.

## DISCUSSION

### A.    The Court Has Personal Jurisdiction over Dr. Paul

#### 1.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(2)

When a defendant brings a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant."  *DiStefano* v. *Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001) (citation omitted); *accord In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).  "Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction.  At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations."  *Dorchester Fin. Sec., Inc.* v. *Banco BRJ, S.A.*, 722 F.3d 81, 84-85 (2d Cir. 2013) (per curiam) (citation omitted).  All jurisdictional

allegations "are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor[.]" *A.I. Trade Fin., Inc.* v. *Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).  However, the court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation[.]" *In re Terrorist Attacks*, 714 F.3d at 673 (citations omitted); *see also Licci ex rel. Licci* v. *Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

District courts deciding motions to dismiss for lack of personal jurisdiction typically engage in a two-part analysis.  *First*, the court assesses whether there is "a statutory basis for exercising personal jurisdiction." *Marvel Characters, Inc.* v. *Kirby*, 726 F.3d 119, 128 (2d Cir. 2013).  In making this determination, the court "applies the forum state's personal jurisdiction rules" unless a federal statute "specifically provide[s] for national service of process." *PDK Labs, Inc.* v. *Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks and citations omitted).  *Second*, if there is a statutory basis for personal jurisdiction, the court must decide whether the exercise of jurisdiction comports with due process.  *Sonera Holding B.V.* v. *Çukurova Holding A.Ş.*, 750 F.3d 221, 224 (2d Cir. 2014) (per curiam).

### 2.     New York's Long-Arm Statute

"A district court's personal jurisdiction is determined by the law of the state in which the court is located." *Spiegel* v. *Schulmann*, 604 F.3d 72, 76 (2d Cir. 2010).  Here, the parties agree that the relevant law in assessing the statutory basis, if any, for jurisdiction over Dr. Paul is New York's long-arm

statute.  N.Y. C.P.L.R. § 302(a).  That statute authorizes courts to exercise personal jurisdiction in three circumstances.

*First*, the Court may exercise jurisdiction "over any non-domiciliary ... who in person or through an agent ... transacts any business within the state," so long as the cause of action "aris[es] from" that transaction.  N.Y. C.P.L.R. § 302(a)(1).  Accordingly, a court may exercise personal jurisdiction over a non-domiciliary if two conditions are met: "first, the non-domiciliary must transact business within the state; second, the claims against the non-domiciliary must arise out of that business activity."  *Aquiline Capital Partners LLC* v. *FinArch LLC*, 861 F. Supp. 2d 378, 386 (S.D.N.Y. 2012) (quoting *CutCo Indus., Inc.* v. *Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)).

*Second*, the Court may exercise jurisdiction over a non-domiciliary who "commits a tortious act within the state."  N.Y. C.P.L.R. § 302(a)(2).  Notably, however, this section has been interpreted narrowly by the Second Circuit to require a defendant to be physically present in New York State when committing a tortious act.  *See Bank Brussels Lambert* v. *Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 790 (2d Cir. 1999) (reaffirming that a "defendant's physical presence in New York is a prerequisite to jurisdiction under § 302(a)(2)").

*Third*, the Court may exercise jurisdiction over a non-domiciliary who "commits a tortious act without the state causing injury to person or property within the state."  N.Y. C.P.L.R. § 302(a)(3).  As a sister court in this District has recognized,

> The conferral of jurisdiction under this provision rests on five elements: First, that defendant committed a tortious act outside the state; second, that the cause of action arises from that act; third, that the act caused injury to a person or property within the State; fourth, that defendant expected or should reasonably have expected the act to have consequences in the State; and fifth, that defendant derived substantial revenue from interstate or international commerce.

*In re Sumitomo Copper Litig.*, 120 F. Supp. 2d 328, 341 (S.D.N.Y. 2000) (quoting *LaMarca* v. *Pak-Mor Mfg. Co.*, 95 N.Y.2d 210, 214 (2000)).

### 3. Analysis

#### a. Dr. Paul Transacted Business in New York, and the Claims at Issue Are Substantially Related to Those Transactions

Dr. Paul does not dispute for the purposes of his motion that he transacted business within New York, and therefore, the principal question is whether CCTI's claims against him arise from these transactions. (*See* Paul Br. 14).[2] CCTI makes two claims against Dr. Paul: that he tortiously procured the breach of the Services Agreement and that he tortiously interfered with CCTI's relationships with prospective investors and DOE. (*See* Am. Compl. ¶¶ 125-41). On the issue of personal jurisdiction, CCTI alleges that Dr. Paul transacted business by presenting to CCTI on the Pilot Plant's technology in New York, pitching potential investors on CCTI's technology in New York, raising money for CCTI in New York and attending its shareholder meetings, and attending New York-based conference calls. (*Id.* at ¶ 11). CCTI further

---

[2] Dr. Paul also do not argue any violation of due process, and therefore the Court does undertake a separate analysis of this point.

alleges that these activities were substantially connected to Dr. Paul's tortious behavior, including in particular his decision to sabotage the Services Agreement when CCTI failed to provide him assurances related to his restricted stock holdings. (*Id.* at ¶¶ 74-83). The Court agrees that the allegations suffice.

Assuming that these allegations are true, as the Court must at this stage, Dr. Paul engaged in an ongoing business relationship with CCTI involving numerous activities in New York, and then sabotaged that relationship in response to CCTI's failure to enrich him personally. The tortious actions alleged are closely related to, and indeed arose from, the breakdown of an ongoing New York-based contractual relationship. The "'arising from' prong of section 302(a)(1) does not require a causal link, but rather requires 'a relatedness between the transaction and the legal claim such that the latter is not completely unmoored from the former[.]'" *See Ingenito* v. *Riri USA, Inc.*, 89 F. Supp. 3d 462, 477 (E.D.N.Y. 2015) (quoting *Licci*, 732 F.3d at 168). While the allegations do not demonstrate that Dr. Paul's allegedly tortious activities were caused by the New York transaction, they are hardly "unmoored" from it.

The cases on which Dr. Paul relies to oppose personal jurisdiction involve far more attenuated relationships between transactions and tortious conduct. Dr. Paul cites *AVRA Surgical Robotics, Inc.* v. *Gombert* (*see* Paul Br. 14), but in that case, "all the relevant alleged conduct occurred … in Germany… [and] the contracts and duties allegedly breached were formed and executed in Germany." 41 F. Supp. 3d 350, 359 (S.D.N.Y. 2014). Here, it is alleged, Dr.

Paul repeatedly traveled to New York to support CCTI's business, and only after CCTI rejected his requests for financial enrichment did he sabotage the relationship that he had carefully cultivated. (Am. Compl. ¶¶ 74-83). Dr. Paul also cites *Spencer Trask Ventures, Inc.* v. *Archos S.A.* (*see* Paul Br. 14-15), which rejected personal jurisdiction predicated on "a single fortuitous meeting" in New York. No. 01 Civ. 1169 (LAP), 2002 WL 417192, at *5-6 (S.D.N.Y. Mar. 18, 2002). That case also involved a foreign defendant that avoided New York-based activity. *See id.* Here, Dr. Paul is alleged to have aggressively pursued a relationship with Plaintiff in New York, and then taken retributive actions in response to the failure of that relationship. While these actions may have occurred outside New York, they were a response to the breakdown of a New York-based relationship. The Court concludes that the facts alleged suffice to show that Dr. Paul's "activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Kreutter* v. *McFadden Oil Corp.*, 71 N.Y.2d 460, 467 (1988).

### b. The Court Does Not Find That Dr. Paul's Tortious Activity Occurred in New York

While the Court finds personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1), it briefly examines and rejects the remaining arguments for jurisdiction. The Court quickly concludes that N.Y. C.P.L.R. § 302(a)(2) does not apply in this case. As noted, this prong of the statute is read narrowly and requires physical commission of the tortious act in New York. *See Thackurdeen* v. *Duke Univ.*, 130 F. Supp. 3d 792, 804 (S.D.N.Y. 2015) (holding

that C.P.L.R. § 302(a)(2) requires that the defendant "physically commit the tortious act within New York"). In *Bank Brussels Lambert*, the Second Circuit found communications sent into New York insufficient to create a physical presence. 171 F.3d at 790. The allegedly tortious actions in this case, the inaccurate report and the fictitious invoices, were not generated in New York, and their transmission to CCTI does not create jurisdiction under C.P.L.R. § 302(a)(2).

### c. The Court Finds That the Allegedly Tortious Activity Did Not Cause Injury in New York

Finally, Dr. Paul argues that the Amended Complaint fails to allege that "the act[s] caused injury to a person or property" inside New York. *See LaMarca*, 95 N.Y.2d at 214. In particular, he claims that the alleged financial injury to CCTI does not suffice to create personal jurisdiction over him because "a plaintiff is injured 'where the event giving rise to the injury occurred,' the so-called 'situs of injury.'" (Paul Reply 5 (citing *Pramer S.C.A.* v. *Abaplus Int'l Corp.*, 907 N.Y.S.2d 154, 160 (1st Dep't 2010))). Plaintiff responds by arguing that the inaccurate report and unperformed tests for which it was billed led to the loss of potential customers in New York. (Am. Compl. ¶¶ 74-88). The Court does not find that the events leading to these injuries occurred in New York. Rather, the events that led to the alleged injuries were Dr. Paul's failure to conduct required tests and his failure to produce the desired report, neither of which is alleged to have occurred in New York.

As a fallback position, Plaintiff cites to *Augsbury Corp.* v. *Petrokey Corp.*, 470 N.Y.S.2d 787 (3d Dep't 1983), which held that maliciously injuring a plaintiff's relationship with potential customers could satisfy the injury requirement of C.P.L.R. § 302(a)(3). (CCTI Paul Opp. 12-13). The Court finds that the brief discussion of the issue in *Augsbury* is insufficient to demonstrate that the mere assertion of loss of customers and goodwill by a New York corporation suffices to establish jurisdiction.

*Augsbury* expressly limited its holding, concluding only that "[u]nder the circumstances of the instant case, we infer that defendants could foresee New York as the place injury would occur[.]" 470 N.Y.S.2d at 791 (citing *Sybron Corp.* v. *Wetzel*, 46 N.Y.2d 197, 205-07 (1978)). The case that *Augsbury* cites, *Sybron Corp*, found injury in New York under circumstances in which "New York [was] where [the] plaintiff manufacture[d] and reline[d] glass-lined equipment and the alleged [misappropriated] trade secrets were acquired, and the economic injury [the] plaintiff [sought] to avert stem[med] from the threatened loss of important New York customers." 46 N.Y.2d at 205. Here, by contrast, the economic activity occurred in Oklahoma (Am. Compl. ¶ 18); the alleged misconduct occurred outside New York; and the lost customers are not alleged to be New York residents (*id.* at ¶¶ 136-41).

In short, the Court does not find that the events leading the alleged injury occurred in New York. Therefore, the Court does not find jurisdiction pursuant to C.P.L.R. § 302(a)(3). However, as the Court has found personal

jurisdiction under C.P.L.R. § 302(a)(1), it considers the merits of the allegations against Dr. Paul.

**B.      Plaintiff's Breach of Contract Claims Against Leidos Are Barred by *Res Judicata***

 **1.      Motions to Dismiss Under Rule 12(b)(6)**

The Court now examines the four causes of action in the Amended Complaint.  When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiffs favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)).  A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 570)).

That said, a court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions."  *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted); *see*

*also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### 2.     *Res Judicata* and Failure to Raise a Required Counterclaim

Leidos's arguments focus on the preclusive effect *vel non* of the New York State Action. "To determine whether the doctrine of *res judicata* bars a subsequent action, we consider whether [i] the prior decision was a final judgment on the merits, [ii] the litigants were the same parties, [iii] the prior court was of competent jurisdiction, and [iv] the causes of action were the same." *Corbett* v. *MacDonald Moving Servs.*, 124 F.3d 82, 87-88 (2d Cir. 1997). As to the fourth factor, "[*r*]*es judicata* does not require the precluded claim to actually have been litigated; its concern, rather, is that the party against whom the doctrine is asserted had a full and fair opportunity to litigate the claim." *EDP Med. Computer Sys., Inc.* v. *United States*, 480 F.3d 621, 626 (2d Cir. 2007). Significantly, however, "[w]hile claim preclusion [or *res judicata*] bars relitigation of the events underlying a previous judgment, it does not preclude

litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit." *Curtis* v. *Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000).

The parties accept that the *res judicata* analysis is governed by New York law. (*See* Leidos Br. 8; CCTI Leidos Opp. 3-4). Under New York law, all counterclaims are permissive. *See Batavia Kill Watershed Dist.* v. *Charles O'Desch, Inc.*, 444 N.Y.S.2d 958, 960 (3d Dep't 1981) ("It is apparent that the CPLR does not require that a party plead counterclaims, and, with the possible exception of cases based on waiver ... there is no requirement of compulsory pleading of counterclaims in this State[.]"), *aff'd*, 57 N.Y.2d 796 (1982). However, "a party is not free to remain silent in an action in which he is the defendant and then bring a second action seeking relief inconsistent with the judgment in the first action by asserting what is simply a new legal theory[.]" *Henry Modell & Co.* v. *Minister, Elders & Deacons of the Reformed Protestant Dutch Church*, 68 N.Y.2d 456, 461 (1986); *see also Classic Autos., Inc.* v. *Oxford Resources Corp.*, 612 N.Y.S.2d 32, 33 (2d Dep't 1994) (stating that New York "allows counterclaims to be raised through separate litigation ..., as long as a party defendant does not remain silent in one action, then bring a second suit on the basis of a pre-existing claim for relief that would impair the rights or interests established in the first action").

### 3.    Analysis

The parties do not dispute that the New York State Action resulted in a settlement by which CCTI agreed to pay Leidos $131,539.06. (Am. Compl. ¶¶ 105-06; Fallati Decl., Ex. 11). The parties also do not dispute that the

litigants were the same parties; that the court was of competent jurisdiction; and that the action reached a conclusion with the stipulation of the parties. (Fallati Decl., Ex. 11).  Instead, the parties dispute whether the claims in this case are claims made "on the basis of a pre-existing claim for relief that would impair the rights or interests established in the first action."  *Classic Autos*, 612 N.Y.S.2d at 33.  Leidos's argument on this point is straightforward:  CCTI agreed to a stipulation, by which it acknowledged that it owed Leidos outstanding payments for work performed under the Services Agreement. Therefore, CCTI could not keep silent regarding claims related to improper billing (Am. Compl. ¶ 116), failure to perform (*id.* at ¶ 115), or failure to deliver a report (*id.* at ¶ 113) in that proceeding, and then bring the instant claims for relief, all of which bear directly on the required payments, in a separate suit.

Leidos points to numerous decisions from state and federal courts in New York concluding that a party cannot relitigate contractual performance when it has already agreed to make payments on the disputed performance in a prior action.  (Leidos Br. 9-10).  In *Graham* v. *Select Portfolio Servicing, Inc.*, for instance, the court refused to allow a plaintiff's claims against his mortgage servicing company for failing to comply with its contractual obligations to go forward, when the plaintiff failed to bring those claims in a prior foreclosure action.  156 F. Supp. 3d 491, 509-10 (S.D.N.Y. 2016).  In *Robert* v. *Cooper*, the First Department rejected a plaintiff's attempt to sue an attorney over the latter's fraudulent billing practices, when the subject of attorney's fees was at

the "core" of the litigation in a prior action. 979 N.Y.S.2d 585, 586 (1st Dep't 2014).

Here, CCTI stipulated that Leidos was entitled to unpaid bills in the New York State Action, but now seeks to claim that Leidos failed to perform under the Services Agreement and was not entitled to payment. Using the analysis of the cases just cited, CCTI "remain[ed] silent" in the New York State Action, *see Henry Modell*, 68 N.Y.2d at 461, but now seeks to litigate the same issue of performance here. The Court agrees that CCTI is foreclosed from raising arguments that Leidos failed to perform under the contract, having previously stipulated to owing Leidos payments for that same performance in the New York State Action.

CCTI counters that it did not remain silent, but rather discovered new facts after the stipulation was entered in the New York State Action. The Court finds this argument without merit. CCTI maintains that it could not have known about the failure to perform until it recovered the password that provided access to the Pilot Plant. (*See* Am. Compl. ¶¶ 34-60). CCTI argues, therefore, that it "did not 'remain silent' in the prior action because, at the time, it did not and could not have known there was anything to say." (CCTI Leidos Opp. 6). In examining the Amended Complaint, the Court agrees with Leidos that at numerous points CCTI appears to undercut its own argument with references to disputes that existed between the parties prior to the New York State Action. (*Compare* Am. Compl. ¶¶ 16, 33 (referring to Benham's "subpar performance of the Construction Contract" and "various issues that

had arisen during the performance of the Construction Contract"), *with id.* at ¶¶ 113-15 (alleging that an element of the breach was Leidos's failure to "supervise Benham in the performance of the Construction Contract")). Elements of this dispute clearly existed prior to the stipulation, but were not raised in the New York State Action. This alone negates Plaintiff's claims that it could not have known of Leidos's deficient performance at the time it filed the stipulation.

However, even accepting that CCTI was unaware of certain breaches, the Court does not agree that these gaps in knowledge would defeat the preclusive effect of the New York State Action. Plaintiff relies heavily on *Mason Tenders Dist. Council Pension Fund* v. *Messera*, No. 95 Civ. 9341 (RWS), 1996 WL 578048, at *3 (S.D.N.Y. Oct. 8, 1996), where a court in this District declined to find preclusive effect where, "according to Plaintiffs' allegations, ... Defendants ... concealed from Plaintiffs the kickback and embezzlement scheme from which those claims arose." *Id.* Significantly, however, the *Mason Tenders* decision does not suggest that lack of knowledge will overcome the otherwise preclusive effect of failure to bring a claim; rather, it emphasizes that defendants are not entitled to preclusion where they have concealed material giving rise to the claims at issue.

Separately, CCTI fails to plead concealment with particularity under any standard. The parties dispute what standard to apply to pleadings regarding the potential concealment of breaches in the *res judicata* context. (*See* Leidos Br. 10-11; CCTI Leidos Opp. 8-9; Leidos Reply 5). However, the Court does not

21

find it necessary to resolve this dispute. The pleadings do not provide evidence of any affirmative misstatements regarding performance of the contract beyond the conclusory allegation that "[Dr. Paul] and others had not in fact performed the services indicated on the invoices." (Am. Compl. ¶ 107). This does not constitute active concealment. *See Ningbo Prod. Imp. & Exp. Co.* v. *Eliau,* No. 11 Civ. 650 (PKC), 2011 WL 5142756, at *10 (S.D.N.Y. Oct. 31, 2011) ("[A] party's mere intent not to perform is not sufficient to establish fraudulent conduct." (citation omitted)). CCTI also provides a long description of how it discovered that it did not have the password and SD Card required to operate the Pilot Plant in June 2017, and could not discover certain failures to perform until it regained those items. (CCTI Leidos Opp. 8-9). However, CCTI does not explain why it did not know about the missing password and cards at the time it entered into the stipulation, nor does it offer any suggestion that Leidos concealed these items during the pendency of the New York State Action. Nothing in these allegations resembles an undisclosed "kickback and embezzlement scheme." *Mason Tenders*, 1996 WL 578048, at *3. The Court does not find that the Amended Complaint demonstrates that CCTI could not have known of Leidos's breach when it entered the stipulation, and accordingly finds that CCTI is foreclosed from bringing claims for breach of contract when it entered into a stipulation acknowledging that it owed money under that contract.

CCTI quotes from another district court decision in arguing that such a finding would gut New York's permissive counterclaim rules: "'To hold

otherwise would have the effect of rendering New York a compulsory counterclaim jurisdiction, because any counterclaims not asserted would be barred in subsequent actions.' *Dolan* v. *Select Portfolio Servicing, Inc.,* [No. 13 Civ. 1552 (PKC), 2014 WL 4662247] at *3 (E.D.N.Y. Sept. 18, 2014)." (CCTI Leidos Opp. 7). The Court disagrees, and observes that the very next paragraph in *Dolan* discusses New York's exception for cases where a party remained silent in a prior proceeding. *Dolan*, 2014 WL 4662247, at *4. In the New York State Action, "claims regarding the [Services A]greement … address the 'core' of the litigation in the first action for [unpaid balances] and thus should have been raised in that action." *Robert*, 979 N.Y.S.2d at 586. The Court finds that CCTI's claim for breach of contract is barred by *res judicata*.[3]

## C. Plaintiff Fails to State a Claim Against Leidos for Tortious Interference with the Construction Contract

### 1. Applicable Law

To demonstrate tortious interference with contract, a plaintiff must prove [i] "the existence of a valid contract between the plaintiff and a third party'; [ii] the 'defendant's knowledge of the contract'; [iii] the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; [iv] 'actual breach of the contract'; and [v] 'damages resulting therefrom.'" *Kirch*

---

[3] Because the Court finds the breach of contract claim to be barred by *res judicata*, it does not reach Leidos's arguments regarding failure to state a claim. Leidos largely focuses its briefing on *res judicata* and spends only a paragraph on the failure to state a claim argument in both its initial motion and its reply. (*See* Leidos Br. 13; Leidos Reply. 6). The Court also notes the difficulty of dismissing a breach of contract allegation for failure to state a claim. To make a claim for a breach of contract a "complaint need only allege [i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages." *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

v. *Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting *Lama Holding Co.* v. *Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996)).  Additionally, a plaintiff must allege "that the defendant's actions were the 'but for' cause of the alleged breach — in other words, that there would not have been a breach but for the activities of the defendant." *RSM Prod. Corp.* v. *Fridman*, 643 F. Supp. 2d 382, 405 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010) (summary order).  "Although on a motion to dismiss the allegations in a complaint should be construed liberally, to avoid dismissal of a tortious interference with contract claim a plaintiff must support his claim with more than mere speculation." *Burrowes* v. *Combs*, 808 N.Y.S.2d 50 (1st Dep't 2006).

### 2.  Analysis

As to this claim as well, the parties agree that certain elements are not in dispute.  Leidos does not argue that CCTI has failed to allege the existence of a valid contract between it and Benham, Leidos's knowledge of said contract, the breach of said contract, or damages resulting from that breach.  (*See* Leidos Br. 14).  Instead, Leidos argues that CCTI fails to allege plausibly that Leidos either intentionally procured the breach or was the but-for cause of the breach. (*Id.* at 15).

CCTI offers two mechanisms by which Leidos procured Benham's breach of the Construction Contract:  CCTI alleges that Leidos refused to provide it with the password and SD Card, and instead delivered them to Benham.  (Am. Compl. ¶¶ 37-44).  CCTI also alleges that Ezel, a Leidos employee, billed CCTI for work that he did not perform under the Construction Contract.  (*Id.* at

¶ 62).  Much of CCTI's briefing describes these allegations in substantial detail. (CCTI Leidos Opp. 14-15).  Even with such detail, however, the allegations remain inadequate to state an intentional procurement of a breach.

CCTI's Amended Complaint makes clear that Benham made an independent decision to withhold the password and SD card.  For starters, the allegations regarding the password and the SD Card are that Leidos possessed them and turned them over to Benham rather than CCTI.  (Am. Compl. ¶¶ 40-41).  The Complaint then alleges that Benham refused to provide these items to CCTI.  (*Id.* at. ¶¶ 41-48).  There is no allegation that this refusal to provide the items was done at Leidos's instruction; that Leidos conceived of this plan; or that Leidos even suggested that Benham withhold these items.  Instead, the Amended Complaint alleges that Benham refused to turn over the items until CCTI made a payment.  (*Id.* at. ¶¶ 48-49).  And Ezel's alleged breach is similarly untethered to Leidos's relationship with Benham.  (*See id.* at ¶¶ 61-62).  The Ezel allegations merely state a manner in which the Construction Agreement was breached, and not a manner in which Leidos procured that breach.  The Court does not find that CCTI has plausibly alleged anything other than an independent decision by Benham to breach the Construction Agreement, which may have been eased by certain actions taken by Leidos.  Tortious interference requires more.

These pleading deficiencies are highlighted when this case is compared to the cases cited by CCTI.  (*See* CCTI Leidos Opp. 16-19).  In *Bernberg* v. *Health Management Systems, Inc.*, the defendant stripped a third party of its assets,

forcing this third party to default on the promissory notes it owed the plaintiff. 756 N.Y.S.2d 96, 97-98 (2d Dep't 2003).  In *330 Acquisition Co., LLC* v. *Regency Savings Bank, F.S.B.*, the FDIC sought to honor a contractual agreement with the plaintiff, but the defendant worked to force the FDIC to breach.  741 N.Y.S.2d 24, 26-27 (1st Dep't 2002).  In *Due Pesci Inc.* v. *Threads for Thought, LLC*, the plaintiff alleged that the defendant deliberately reached out to third parties in order to instruct them on breaching an agreement.  35 Misc. 3d 1202(A), 950 N.Y.S.2d 722 (Table) (N.Y. Sup. Ct. 2012).

The case that Plaintiff describes most extensively is *Momentive Performance Materials USA, Inc.* v. *AstroCosmos Metallurgical, Inc.,* No. 07 Civ. 567 (FJS) (DRH), 2009 WL 1514912 (N.D.N.Y. June 1, 2009).  (*See* CCTI Leidos Opp. 17-19).  However, in that case, the breaching party remained a subsidiary of the defendant, and was allegedly directed to breach:  "AstroCosmos refused to perform under the terms of the Replacement Agreement at the direction and command of Defendants."  *Momentive Performance*, 2009 WL 1514912, at *3. Here, Leidos completed the sale of Benham *before* the alleged breach (Am. Compl. ¶¶ 19-22, 34-60), and there is no allegation that Leidos directed or commanded Benham to breach.  None of CCTI's cases involves a plaintiff alleging both that a contractual counterparty deliberately and independently breached an agreement for its own economic benefit and that a third party was liable for procuring that breach.  All of them involve a defendant directing or setting in motion the alleged breach.  For all of these reasons, the Court finds

that CCTI has failed to allege adequately that Leidos procured or caused

Benham's alleged breach.

**D.     Plaintiff Fails to State a Claim Against Dr. Paul for Tortious Interference with the Services Agreement**

Plaintiff's claim for tortious interference with contract against Dr. Paul

suffers a similar fate.  The Amended Complaint makes a number of allegations

that Dr. Paul failed to perform actions that were required under the Services

Agreement.  (*See, e.g.*, Am. Compl. ¶ 129).  But Dr. Paul argues — correctly —

that mere breaches of the Services Agreement are not enough, and that Plaintiff

must allege either actions that Dr. Paul took beyond the scope of his

employment or personal motivations for the alleged misconduct:

> "Generally, 'a corporate officer who is charged with inducing the breach of a contract between the corporation and a third party is immune from liability if it appears that he is acting in good faith as an officer and did not commit independent torts or predatory acts against another.'" *Nahabedian* v. *Intercloud Sys., Inc.*, No. 15 Civ. 669, 2016 WL 155084, at *6 (S.D.N.Y. Jan. 12, 2016) (quoting *G.D. Searle & Co.* v. *Medicore Commc'ns, Inc.*, 843 F. Supp. 895, 911 (S.D.N.Y. 1994)). However, if "the acts of the defendant corporate officer[] which resulted in the tortious interference with contract either were beyond the scope of their employment or, if not, were motivated by [his] personal gain, as distinguished from gain for the corporation," [he] may be liable. *Id.* at *6 (quoting *Petkanas* v. *Kooyman*, 759 N.Y.S.2d 1, 2 (1st Dep't 2003)).

*VR Optics, LLC* v. *Peloton Interactive, Inc.*, No. 16 Civ. 6392 (JPO), 2017 WL

3600427, at *6 (S.D.N.Y. Aug. 18, 2017).  Dr. Paul argues that the allegations

show nothing other than that he took actions within the scope of his

employment at Leidos, actions that CCTI now claims to be in breach of its agreement with Leidos. (Paul Br. 18-20).

CCTI argues that it has adequately alleged that Dr. Paul took actions for purely personal gain or, in the alternative, actions beyond the scope of his employment with Leidos. As support, CCTI points to allegations in the Amended Complaint that Dr. Paul chose to sabotage the Services Agreement in the face of CCTI's refusal to provide releases for his restricted stock or to provide him a $70,000 payment. (Am. Compl. ¶¶ 92-104, 132). As further support, CCTI points to a text message from Dr. Paul to CCTI that allegedly read, "Any progress on the issuing of stock before the deal closes." (*Id.* at ¶ 94). Dr. Paul offers alternative explanations for this text (*see* Paul Br. 19), but at the pleading stage, drawing all inferences in favor of CCTI, the Court cannot rule out the possibility that Dr. Paul acted for his own personal gain in failing to perform until CCTI acceded to his demands. *See Island Two LLC* v. *Island One, Inc.*, No. 13 Civ. 2121 (LGS), 2013 WL 5380216, at *3 (S.D.N.Y. Sept. 26, 2013) (finding at the motion to dismiss stage that similar "allegations [were] sufficient to support a claim" that a corporate officer acted "outside the scope of [his] employment" and sought to "personally profit").

However, the claim fails for a separate reason: The Amended Complaint fails to allege that Dr. Paul's actions, whether personally motivated or otherwise, were the but-for cause of any breach of the Services Agreement. Dr. Paul argues, similarly to Leidos's argument in the context of Benham, that the Amended Complaint cannot state a claim for tortious interference, because it

specifically alleges that Leidos elected to breach the Services Agreement independently of any action by Dr. Paul. (*See* Am. Compl. ¶¶ 77-78 ("Leidos took the position that it was not even required to provide a 'comprehensive report,' pursuant to the Services Agreement and manufactured reasons by which it was supposedly unable to do so. ... Leidos took this position notwithstanding [Dr Paul's ... [contrary] position[.]")). It is obvious that if Leidos elected to breach independently, Dr. Paul cannot be the but-for cause of that breach. The Court finds that the inclusion of these allegations in the Amended Complaint foreclose CCTI's tortious interference of contract claim against Dr. Paul. *See RSM Prod. Corp.*, 643 F. Supp. 2d at 405 (holding that for tortious interference of contract claims, a plaintiff must show "that there would not have been a breach but for the activities of the defendant"). Here, CCTI clearly alleges that Leidos acted in numerous ways to frustrate the Services Agreement on its own and not at the direction of Dr. Paul.

Try as it might, CCTI cannot have it both ways: The breach of contract allegations in the Amended Complaint make clear that CCTI believes Leidos breached through failing to provide the final report when required to do so. (Am. Compl. ¶ 113). In its opposition, CCTI states for the first time that "but for [Dr. Paul's] conduct, the Services Agreement would have been performed." (CCTI Paul Opp. 20). The Court cannot credit this assertion, which runs counter to the allegations in the Amended Complaint that Leidos itself effected the breach of the Services Agreement against the advice of Dr. Paul. "It is axiomatic that a complaint cannot be amended by the briefs in opposition to a

motion to dismiss." *LLM Bar Exam, LLC* v. *Barbri, Inc.*, 271 F. Supp. 3d 547, 580 (S.D.N.Y. 2017) (internal quotation marks and citation omitted).  The Court finds that Plaintiff has failed to state a claim for tortious interference against Dr. Paul with respect to the Services Agreement.

**E.    Plaintiff Fails to State a Claim for Tortious Interference with Prospective Economic Advantage Against Leidos, But States a Claim Against Dr. Paul**

### 1.    Applicable Law

To state a claim for intentional interference with prospective economic advantage" under New York law, "a party must allege that: '(i) the plaintiff had business relations with a third-party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship.'" *Lombard* v. *Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir. 2002)).  A plaintiff must also establish causation by demonstrating "that she 'would have entered into an economic relationship but for the defendant's wrongful conduct.'" *Tucker* v. *Wyckoff Heights Med. Ctr.*, 52 F. Supp. 3d 583, 598 (S.D.N.Y. 2014) (quoting *Memnon* v. *Clifford Chance US, LLP,* 667 F. Supp. 2d 334, 349 (S.D.N.Y. 2009)).

The salient distinction between claims for tortious interference with contract and claims for tortious interference with prospective economic advantage concerns the defendant's mental state:  "In the case of tortious interference with contract, a plaintiff may recover if the plaintiff can demonstrate that the 'defendant's deliberate interference result[ed] in a breach

of [the] contract.'" *Gym Door Repairs, Inc.* v. *Young Equip. Sales, Inc.*, 206 F.

Supp. 3d 869, 908 (S.D.N.Y. 2016), *as amended*, (Sept. 16, 2016),

*reconsideration denied*, 2016 WL 6652733 (S.D.N.Y. Nov. 10, 2016)

(quoting *Carvel Corp.* v. *Noonan*, 3 N.Y.3d 182, 189 (2004)). But "[i]n the case

of tortious interference with prospective economic advantage, ... the 'plaintiff

must show more culpable conduct on the part of the defendant.'" *Id.* (quoting

*Carvel*, 3 N.Y.3d at 190). To state a prospective-economic-advantage claim, a

plaintiff must show that "the defendant's conduct ... amount[s] to a crime or an

independent tort," or that the defendant has "engage[d] in conduct for the sole

purpose of inflicting intentional harm on" the plaintiff." *Carvel*, 3 N.Y.3d at

190 (internal quotation marks and citation omitted); *see also Sidney Frank*

*Importing Co.* v. *Beam Inc.*, 998 F. Supp. 2d 193, 211-12 (S.D.N.Y. 2014)

(finding that mental state for prospective-economic-advantage claim "is more

exacting" than that for a contract-interference claim "because courts must

balance a plaintiff's expectation in establishing a contractual relationship

against the competing interest of the interferer ... and the broader interest of

fostering healthy competition" (internal quotation marks and citations

omitted)).

### 2.   Analysis

The fourth claim in the Amended Complaint for tortious interference with

prospective economic advantage is the sole claim brought against both

Defendants. (*See* Am. Compl. ¶¶ 136-41). CCTI alleges that it had business

relationships with both potential investors and DOE, which relationships

Defendants had knowledge of and interfered with by failing to perform under the Services Agreement. (*Id.*). From this, Plaintiff argues that Defendants intentionally interfered with these third-party business relationships.

The Court can easily dispose of the claim against Leidos. CCTI fails to point to any allegation in the Amended Complaint that Leidos's conduct included any "crime" or "independent tort," *see Carvel*, 3 N.Y.3d at 190, and CCTI candidly acknowledges that it has not made such an allegation (*see* CCTI Leidos Opp. 19-20). CCTI instead argues that it has alleged that Leidos's breaching activity was done "for the sole purpose of inflicting intentional harm on the plaintiff." (*Id.* at 20-21 (quoting *Carvel*, 3 N.Y.3d at 190)). However, the allegedly interfering activities are little more than restatements of the breach of contract allegations with conclusory add-ons concerning Leidos's mindset:

> CCTI has alleged the requisite element of wrongful means through the malicious acts of its employees ([Am. Compl.] ¶ 103), improperly preventing access to the pilot plant (*id.* ¶¶ 34-63), and an improper scheme by providing certain representations, refusing to provide additional material to support those representations and then providing contradictory representations in the Final Report (*id.* ¶¶ 23-31, 73-82, 84-91.) Further, CCTI has alleged that Leidos, through its employee, maliciously interfered with CCTI's relationship with the DOE by inaccurately and unnecessarily representing to the DOE that CCTI was financially unstable, thereby damaging CCTI's relationship with the DOE. (*Id.* at [¶] 97.)

(CCTI Leidos Opp. 20).[4]

---

[4] The sole allegations in this list that is not a restatement of the breach allegations is the claim regarding Dr. Paul's communication with DOE. (Am. Compl. ¶ 97). However, CCTI elsewhere alleges that this action was "wholly outside the scope of [Dr. Paul's]

Several courts in this District have rejected similar pleadings that attempted to recast contractual breaches as tortious interference claims under *Carvel*. *See, e.g., Chanicka* v. *JetBlue Airways Corp.*, 243 F. Supp. 3d 356, 361 (E.D.N.Y. 2017) ("Although Plaintiff attempts to recast [breaches] … as "knowing[] … misrepresentations" and "intentionally false[ ] report[s]" … , the allegations in the Complaint do not allow this Court to infer that [Defendant] took any intentional actions to interfere with Plaintiff's [prospective economic relations.]"); *Campeggi* v. *Arche Inc.*, No. 15 Civ. 1097 (PGG), 2016 WL 4939539, at *9 (S.D.N.Y. Sept. 14, 2016) (holding that "alleg[ations] that … Defendants 'acted solely out of malice' … [do not] make … conclusory assertion[s] plausible …, and a bare assertion that a defendant acted out of malice will not suffice"). The Court does not find that CCTI has plausibly alleged that Leidos has engaged in conduct for the sole purpose of inflicting intentional harm on the Plaintiff. It finds, therefore, that CCTI has failed to state a claim for prospective interference with economic advantage against Leidos.

That said, the Court *does* find that CCTI has adequately stated a claim for tortious interference with prospective economic advantage against Dr. Paul with regards to CCTI's relationship with DOE. It is true that the allegations of malice are minimal in the Amended Complaint. However, unlike the Leidos allegations, CCTI has alleged facts concerning Dr. Paul that, taken as true,

---

authority [from Leidos]" and undertaken "to further his own individual standing with the DOE" (Am. Compl. ¶¶ 132-33).

transcend mere breach of contract.  Specifically, CCTI states that Dr. Paul maliciously misrepresented data that he knew would be transmitted to DOE (*see* Am. Compl. ¶¶ 23-26, 28, 92-104); demanded personal payment for a report DOE required (*see id.* at ¶¶ 74, 92-104, 132); and planted false expectations with DOE (*see id.* at ¶¶ 73-83, 90-104).  At this stage of the case, these allegations of intentionally false communications in the service of personal gain suffice to state that Dr. Paul "engage[d] in conduct for the sole purpose of inflicting intentional harm on" CCTI.  *Carvel*, 3 N.Y.3d at 190; *see also Freedman* v. *Pearlman*, 706 N.Y.S.2d 405, 409 (1st Dep't 2000) ("[W]e find that plaintiff[] set forth sufficient allegations of an intentionally fallacious communication with prospective [contractual partners] to survive dismissal at this juncture.").  The Court finds that the Amended Complaint sufficiently alleges that (i) CCTI had business relations with DOE; (ii) Dr. Paul interfered with those business relations through false representations and the cultivation of false expectations; (iii) Dr. Paul acted for a wrongful purpose to obtain personal benefits; and (iv) these acts injured the relationship.  *See Lombard*, 280 F.3d at 214.

As to CCTI's claim that Dr. Paul tortuously interfered with potential investors, the Court agrees with Dr. Paul that the claim "fails to allege that Dr. Paul knew of CCTI's relations with the investors mentioned in ¶¶ 87 and 88 or that Dr. Paul directed any conduct (much less wrongful conduct) at them." (Paul Br. 24).  CCTI responds that the Amended Complaint makes clear that Dr. Paul was involved in soliciting investors from Shenuan, China, as well as

unnamed potential investors.  (*See* Am. Compl. ¶¶ 86, 102).  The Court does not find that the Amended Complaint specifies that Dr. Paul interfered with a potential investment from the Shenuan investors, as the paragraphs at issue do not refer back to this group.  (*See id.* at ¶¶ 87-88 (referencing two "potential investors" seeking to buy "70% of CCTI", but leaving unmentioned the Shenuan investors)).

The Amended Complaint also does not contain any allegations that Dr. Paul knew of the potential purchasers of 70% of CCTI or that he directed any action at them.  In opposition, CCTI argues again that it stated a claim for interference with the Shenuan investors, but the Court again finds that CCTI is seeking to amend its pleadings through opposition briefing.  The Court rejects this argument, which is contradicted by the text of the Amended Complaint.  In consequence, the Court does not find that the Amended Complaint has adequately alleged that Dr. Paul was aware of the potential investors or directed any action at them.  Therefore, the Court finds that CCTI has failed to state a claim against Dr. Paul for tortious interference with potential investors.

In sum, the Court dismisses CCTI's claims for tortious interference with the sole exception of the claim against Dr. Paul for tortious interference with CCTI's prospective relationship with DOE.

## CONCLUSION

For the reasons set forth above, Leidos's motion to dismiss is GRANTED. Dr. Paul's motion to dismiss is GRANTED IN PART and DENIED IN PART.  The surviving claim from the Amended Complaint is CCTI's claim for tortious

interference with prospective economic advantage against Dr. Paul with regards to DOE.

The Clerk of Court is directed to terminate the motions at docket entries 49 and 52. The parties are hereby ORDERED to file a joint letter on or before **April 22, 2019**, advising the Court of the status of discovery and proposing next steps in this case.

SO ORDERED.

Dated:      March 28, 2019
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge